```
                              FILED
                    CLERK, U.S. DISTRICT COURT

                          4/19/2022

                    CENTRAL DISTRICT OF CALIFORNIA
                    BY:        CD        DEPUTY
```

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

March 2022 Grand Jury

| UNITED STATES OF AMERICA, | CR 2:22-cr-00153-DMG |
|---|---|
| Plaintiff, | I N D I C T M E N T |
| v. | [18 U.S.C. § 1343: Wire Fraud; 18 U.S.C. § 641: Theft of Government Property; 18 U.S.C. § 1956(a)(1)(B)(i): Concealment Money Laundering; 18 U.S.C. §§ 981 and 982 and 28 U.S.C. § 2461(c): Criminal Forfeiture] |
| ARTUR CHANCHIKYAN, | |
| Defendant. | |

The Grand Jury charges:

COUNTS ONE THROUGH THREE

[18 U.S.C. § 1343]

A.  INTRODUCTORY ALLEGATIONS

At times relevant to this Indictment:

The Defendant and Relevant Entities

1.  Defendant ARTUR CHANCHIKYAN was a resident of Los Angeles, California.

2. Gentle Touch Home Health Care, Inc. ("Gentle Touch"), was a corporation registered in California with a business address in North Hollywood, California. Gentle Touch purported to be a home health company. Gentle Touch had a checking account with Bank of America in Los Angeles County (the "Gentle Touch Account"). Defendant CHANCHIKYAN caused Gentle Touch to cease its operations following the suspension of Gentle Touch's Medicare payments on or about December 27, 2019, by CMS, through a Unified Program Integrity Contractor, based on "allegations of fraud."

3. A-1 Landing, Inc. ("A-1 Landing"), was a corporation registered in California with a business address in North Hollywood, California. A-1 Landing had a checking account with Bank of America in Los Angeles County (the "A-1 Landing Account").

4. The MV Family Trust ("MV Trust") was formed in the State of California with a listed address in Porter Ranch, California and purported to be a trust. MV Trust had a checking account with Bank of America in Los Angeles County (the "MV Trust Account").

5. Defendant CHANCHIKYAN owned and controlled Gentle Touch and A-1 Landing and was a trustee of the MV Trust.

6. Defendant CHANCHIKYAN was a signatory on the Gentle Touch Account, the A-1 Landing Account, and the MV Trust Account.

7. An individual ("Individual 1") was a resident of Los Angeles, California, and a trustee of the MV Trust. Individual 1 was a signatory on the MV Trust Account.

### The Medicare Program

8. The Medicare Program ("Medicare") was a federal health care benefit program, affecting commerce, that provided benefits to individuals who were 65 years and older or disabled. Medicare was administered by the Centers for Medicare and Medicaid Services ("CMS"), a federal agency under the United States Department of Health and Human Services ("HHS"). Medicare was a "health care benefit program" as defined by Title 18, United States Code, Section 24(b) in that it was a public plan or contract affecting commerce, and a "Federal health care program" as defined by 42 U.S.C. § 1320a-7b(f).

9. Medicare was divided into different program "parts": Part A (hospital services), Part B (physician services), Part C (Medicare Advantage), and Part D (prescription drug coverage).

### The CARES Act

10. In March 2020, Congress passed the Coronavirus Aid, Relief, and Economic Security ("CARES") Act, which was designed to provide emergency financial assistance to the millions of Americans suffering due to the COVID-19 pandemic.

11. The CARES Act established several new temporary programs and provided for expansion of others, including programs created and/or administered by HHS and the United States Small Business Administration ("SBA").

### The Provider Relief Fund

12. One source of relief provided by the CARES Act was the appropriation of moneys to help health care providers ("Providers") that were financially impacted by COVID-19, as well as to provide care to patients who were suffering from

COVID-19 and compensate providers for the cost of that care (the "Provider Relief Fund"). HHS, through its agency, the Health Resources and Services Administration ("HRSA"), oversaw and administered the Provider Relief Fund.

13. In order to rapidly provide funding to Providers during the pandemic, HRSA distributed payments under the CARES Act Provider Relief Fund ("Provider Relief Fund Payment" or "Payment") to Providers who: (a) billed Medicare fee-for-service (Parts A or B) in Calendar Year 2019; (b) were not currently terminated from participation in Medicare or precluded from receiving payment through Medicare Advantage or Part D; (c) were not currently excluded from participation in Medicare, Medicaid, and other Federal health care programs; and (d) did not currently have Medicare billing privileges revoked. Providers meeting these criteria automatically received the Provider Relief Fund Payment and did not have to apply for the funding, but were required to comply with the terms and conditions of the Provider Relief Fund ("Terms and Conditions") if they retained such funding.

14. Provider Relief Fund recipients attested to their compliance with the Terms and Conditions in one of two ways. First, Provider Relief Fund recipients were notified that they could submit an attestation through an online portal confirming receipt of the funds and agreeing to the Terms and Conditions. Second, recipients were notified that, if they kept the money for a period that exceeded 90 days from receipt, they were deemed to have accepted the Terms and Conditions of the Provider Relief Fund.

4

15. Providers who attested to the Terms and Conditions acknowledged that their commitment to full compliance with the terms and conditions was material to the HHS Secretary's decision to disburse Provider Relief Fund Payments to them. Providers further acknowledged that non-compliance with any Term or Condition could cause the HHS Secretary to recoup some or all of the Payment.

16. Providers who attested to the Terms and Conditions certified that they:

    a. billed Medicare in Calendar Year 2019;

    b. provided diagnoses, testing, or care for individuals with possible or actual cases of COVID-19 after January 31, 2020;

    c. were not then terminated from participation in Medicare or precluded from receiving payment through Medicare Advantage or Part D;

    d. were not then excluded from participation in Medicare, Medicaid, and other Federal health care programs;

    e. did not then have Medicare billing privileges revoked;

    f. would only use the Payment to prevent, prepare for, and respond to the coronavirus, and that the Payment would reimburse the recipient only for health-care-related expenses or lost revenues that were attributable to the coronavirus;

    g. provided information relating to the Payment that was true, accurate, and complete and that any deliberate omission, misrepresentation, or falsification of any information

5

was punishable by, inter alia, criminal penalties, including but not limited to imprisonment; and

      h.  would maintain appropriate records and cost documentation to substantiate the reimbursement of costs under the disbursement.

    <u>The Small Business Administration</u>

    17.  The SBA was an agency of the United States government. The mission of the SBA was to maintain and strengthen the nation's economy by enabling the establishment and viability of small businesses and by assisting in the economic recovery of communities after disasters.

    18.  As part of this effort, the SBA enabled and provided for loans through financial institutions, such as banks, credit unions, and other lenders, that had government-backed guarantees. The SBA also provided direct loans.

    <u>The Paycheck Protection Program</u>

    19.  Another form of assistance provided by the CARES Act was the authorization of United States taxpayer funds in forgivable loans to small businesses for job retention and certain other expenses. This financial relief was referred to as the Paycheck Protection Program ("PPP").

    20.  To obtain a PPP loan, a qualifying business was required to submit a PPP loan application signed by an authorized representative of the business. The PPP loan application required the small business (through its authorized representative) to acknowledge the program rules and make certain affirmative certifications in order to be eligible to obtain the PPP loan. Such certifications included the

requirements that the applicant affirm that it "was in operation on February 15, 2020 and had employees for whom [applicant] paid salaries and payroll taxes or paid independent contractors" and that the PPP loan proceeds "w[ould] be used to retain workers and maintain payroll or make mortgage interest payments, lease payments, and utility payments." The applicant (through its authorized representative) was also required to attest to and understand that "any use of the proceeds of the Loan other than as permitted by the CARES Act, or any false or misleading information or statements provided to the [financial institution] in its application for the Loan or in this [promissory n]ote may subject the [applicant] to criminal and civil liability under applicable state and federal laws and regulations . . . ." In the PPP loan application, the applicant was required to state, among other things, its: (a) average monthly payroll expenses; and (b) number of employees. These figures were used to calculate the amount of money the small business was eligible to receive under the PPP. In addition, the applicant was required to provide documentation showing its payroll expenses.

21. A business's PPP loan application was received and processed, in the first instance, by a participating financial institution. If a PPP loan application was approved, the participating financial institution would fund the PPP loan using its own monies.

22. PPP loan proceeds were required to be used by the business on certain permissible expenses, namely, payroll costs, interest on mortgages, rent, and utilities. The PPP allowed the

interest and principal on the PPP loan to be entirely forgiven if the business spent the loan proceeds on these expenses within a designated period of time and used at least a minimum amount of the PPP loan proceeds toward payroll expenses.

### The Economic Injury Disaster Loan Program

23. The Economic Injury Disaster Loan Program ("EIDL") was an SBA program that provided low-interest financing to small businesses, renters, and homeowners in regions affected by declared disasters.

24. The CARES ACT authorized the SBA to provide EIDL loans of up to $2 million to eligible small businesses experiencing substantial financial disruption due to the COVID-19 pandemic.

25. To obtain an EIDL loan, a qualifying business was required to submit an application to the SBA and provide information about the business's operations, such as the number of employees, gross revenue for the 12-month period preceding the disaster, and cost of goods sold in the 12-month period preceding the disaster. In the case of EIDL loans for COVID-19 relief, the 12-month period was the 12-month period from January 31, 2019, to January 31, 2020. The applicant was also required to certify that all of the information in the application was true and correct to the best of the applicant's knowledge.

26. EIDL loan applications were submitted directly to the SBA and processed by the agency with support from a government contractor. The amount of the loan, if the application was approved, was determined based, in part, on the information provided by the application about employment, revenue, and cost

of goods sold, as described in paragraph 25 above.  Any funds issued under an EIDL loan were issued directly by the SBA.

27.  EIDL loan funds could be used for payroll expenses, sick leave, production costs, and business obligations, such as debts, rent, and mortgage payments.  If the applicant also obtained a loan under the PPP, the EIDL loan funds could not be used for the same purpose as the PPP loan funds.

### Relevant Financial Institutions

28.  "Lender A" was a financial institution insured by the Federal Deposit Insurance Corporation ("FDIC") that was an approved SBA lender of PPP loans.  Lender A was located in Los Angeles County and was a "financial institution" as defined in Title 18, United States Code, Section 20.

B.  THE SCHEME TO DEFRAUD

29.  Beginning no later than in or around March 2020, and continuing until at least in or around April 2021, in Los Angeles County, within the Central District of California, and elsewhere, defendant CHANCHIKYAN, together with others known and unknown to the Grand Jury, knowingly and with intent to defraud, devised, participated in, and executed a scheme to defraud a financial institution, namely, Lender A, and the SBA as to material matters, and to obtain money and property owned by and in the custody and control of Lender A and the SBA by means of material false pretenses, representations, and promises, and the concealment of material facts.

C.   MANNER AND MEANS TO ACCOMPLISH THE SCHEME TO DEFRAUD

30. The fraudulent scheme operated and was carried out, in substance, as follows:

a.   Following the cessation of Gentle Touch's operations, on or about May 1, 2020, defendant CHANCHIKYAN applied with Lender A for a PPP loan on behalf of Gentle Touch. In that application, defendant CHANCHIKYAN made and caused to be made materially false statements to Lender A, including: (i) false representations that Gentle Touch was in operation on February 15, 2020 and had employees for whom Gentle Touch paid salaries and payroll taxes or paid independent contractors; (ii) false representations regarding the number of employees to whom Gentle Touch paid wages and Gentle Touch's average monthly payroll expenses at the time of the application; and (iii) false certifications that the loan would be used for permissible business purposes, even though defendant CHANCHIKYAN knew that, at the time, Gentle Touch was no longer in operation.

b.   As a result of and in reliance on these false and fraudulent representations and certifications in the PPP loan application, Lender A deposited approximately $45,472 in PPP loan proceeds into the Gentle Touch Account.

c.   On or about July 2, 2020, defendant CHANCHIKYAN also applied to the SBA for an EIDL loan on Gentle Touch's behalf. In that application, defendant CHANCHIKYAN made and caused to be made materially false statements, including false representations regarding the number of employees to whom Gentle Touch paid wages and Gentle Touch's average monthly payroll expenses at the time of the application, and false

certifications that the loan would be used for permissible business purposes, even though defendant CHANCHIKYAN knew that, at the time, Gentle Touch was no longer in operation.

        d.   As a result of and in reliance on these false and fraudulent representations and certifications in the EIDL loan application, the SBA deposited approximately $159,900 in EIDL loan proceeds into the Gentle Touch Account.

        e.   Defendant CHANCHIKYAN, together with other co-schemers, transferred and caused to be transferred the PPP and EIDL loan proceeds into bank accounts that defendant CHANCHIKYAN and his co-schemers controlled, where those proceeds were used for expenses different from those defendant CHANCHIKYAN certified (and the PPP and EIDL programs required) that they would be used for, including defendant CHANCHIKYAN's own personal benefit and for the benefit of his co-schemers, including the purchase of residential property in Northridge, California.

D.   <u>USE OF THE WIRES</u>

    31.   On or about the following dates, in Los Angeles County, within the Central District of California, and elsewhere, for the purpose of executing the above-described scheme to defraud, defendant CHANCHIKYAN, together with others known and unknown to the Grand Jury, transmitted and caused the transmission of the following items by means of wire communication in interstate commerce:

| COUNT | DATE | INTERSTATE WIRE TRANSMISSION |
|---|---|---|
| ONE | 5/4/20 | Transfer of approximately $45,472 in PPP loan proceeds from Lender A, sent by means of interstate wire, into the Gentle Touch Account. |
| TWO | 7/7/20 | Transfer of approximately $10,000 in EIDL loan proceeds from the SBA, sent by means of an interstate wire, into the Gentle Touch Account. |
| THREE | 7/23/20 | Transfer of approximately $149,900 in EIDL loan proceeds from the SBA, sent by means of an interstate wire, into the Gentle Touch Account. |

## COUNTS FOUR AND FIVE

## [18 U.S.C. § 641]

32. The Grand Jury re-alleges paragraphs 1 through 28 and 30 of this Indictment here.

A. THEFT OF GOVERNMENT PROPERTY

33. On or about the following dates, in Los Angeles County, within the Central District of California, and elsewhere, defendant CHANCHIKYAN knowingly and willfully stole, purloined, and converted to his own use and the use of another, and without authority, conveyed and disposed of, money and a thing of value greater than $1,000 from HHS, a department of the United States, namely, the following amounts of an approximately $139,736 payment from the HHS Provider Relief Fund that was deposited into the Gentle Touch Account on or about April 17, 2020, with the intent to deprive HHS of the use and benefit of that money. Defendant CHANCHIKYAN did so, knowing that Gentle Touch was not entitled to these Provider Relief Funds and that he did not use the funds to prevent, prepare for, and respond to COVID-19, or reimburse Gentle Touch for health care related expenses or lost revenues attributable to COVID-19, as required under the terms and conditions applicable to the Provider Relief Fund payments:

| COUNT | DATE | APPROX. AMOUNT | DESCRIPTION |
|---|---|---|---|
| FOUR | 4/17/20 | $100,000 | Transfer to the A-1 Landing Account. |
| FIVE | 4/20/20 | $23,000 | Transfer to the A-1 Landing Account. |

COUNTS SIX AND SEVEN

[18 U.S.C. § 1956(a)(1)(B)(i)]

34. The Grand Jury re-alleges paragraphs 1 through 28, 30 through 31, and 33 of this Indictment here.

35. On or about the following dates, in Los Angeles County, within the Central District of California, and elsewhere, defendant CHANCHIKYAN, and others known and unknown to the Grand Jury, knowingly conducted, and willfully caused others to conduct, the following financial transactions affecting interstate commerce, knowing that the property involved the proceeds of some form of unlawful activity, and which was, in fact, the proceeds of specified unlawful activity, that is, wire fraud, in violation of Title 18, United States Code, Section 1343, and theft of government property, in violation of Title 18, United States Code, Section 641, knowing that the transactions were designed in whole and in part to conceal and disguise the nature, location, source, ownership, and control of such proceeds:

| COUNT | DATE | DESCRIPTION |
|---|---|---|
| SIX | 7/31/20 | Transfer of $55,000 from the Gentle Touch Account to the MV Trust Account. |
| SEVEN | 7/31/20 | Transfer of $45,000 from the Gentle Touch Account to the MV Trust Account. |

FORFEITURE ALLEGATION ONE

[18 U.S.C. § 982]

1. Pursuant to Rule 32.2(a) of the Federal Rules of Criminal Procedure, notice is hereby given that the United States of America will seek forfeiture as part of any sentence, pursuant to Title 18, United States Code, Section 982(a)(2), in the event of defendant ARTUR CHANCHIKYAN's conviction of the offenses set forth in any of Counts One through Three of this Indictment.

2. Defendant CHANCHIKYAN, if so convicted, shall forfeit to the United States of America the following:

(a) All right, title, and interest in any and all property real or personal, constituting, or derived from, any proceeds obtained, directly or indirectly, as a result of the offense, including, but not limited to, certain real property referred to herein as Residential Property 1 located in the County of Los Angeles, State of California, APN 2701-093-035; and

(b) To the extent such property is not available for forfeiture, a sum of money equal to the total value of the property described in subparagraph (a).

3. Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b), defendant CHANCHIKYAN, if so convicted, shall forfeit substitute property, up to the total value of the property described in the preceding paragraph if, as the result of any act or omission of the defendant, the property described in the preceding paragraph, or any portion thereof: (a) cannot be

15

located upon the exercise of due diligence; (b) has been transferred, sold to or deposited with a third party; (c) has been placed beyond the jurisdiction of the court; (d) has been substantially diminished in value; or (e) has been commingled with other property that cannot be divided without difficulty.

FORFEITURE ALLEGATION TWO

[18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c)]

1. Pursuant to Rule 32.2 of the Federal Rules of Criminal Procedure, notice is hereby given to defendant ARTUR CHANCHIKYAN that the United States of America will seek forfeiture as part of any sentence, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), in the event of defendant CHANCHIKYAN's conviction of the offenses set forth in either of Counts Four or Five of this Indictment.

2. Defendant CHANCHIKYAN, if so convicted, shall forfeit to the United States of America the following:

(a) All right, title, and interest in any and all property, real or personal, constituting, or derived from, any proceeds traceable to the offense including, but not limited to, certain real property referred to herein as Residential Property 1 located in the County of Los Angeles, State of California, APN 2701-093-035; and

(b) To the extent such property is not available for forfeiture, a sum of money equal to the total value of the property described in subparagraph (a).

3. Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c), defendant CHANCHIKYAN, so convicted, shall forfeit substitute property, up to the value of the property described in the preceding paragraph if, as the result of any act or omission of the defendant, the property described in the

17

preceding paragraph or any portion thereof (a) cannot be located upon the exercise of due diligence; (b) has been transferred, sold to, or deposited with a third party; (c) has been placed beyond the jurisdiction of the court; (d) has been substantially diminished in value; or (e) has been commingled with other property that cannot be divided without difficulty.

FORFEITURE ALLEGATION THREE

[18 U.S.C. § 982]

1.  Pursuant to Rule 32.2(a) of the Federal Rules of Criminal Procedure, notice is hereby given that the United States of America will seek forfeiture as part of any sentence, pursuant to Title 18, United States Code, Section 982(a)(1), and Title 28, United States Code, Section 2461(c), in the event of defendant ARTUR CHANCHIKYAN's conviction of the offenses set forth in either of Counts Six or Seven of this Indictment.

2.  Defendant CHANCHIKYAN, if so convicted, shall forfeit to the United States of America the following:

(a)  All right, title, and interest in any and all property, real or personal, involved in such offense, and any property traceable to such property, including, but not limited to, certain real property referred to herein as Residential Property 1 located in the County of Los Angeles, State of California, APN 2701-093-035; and

(b)  To the extent such property is not available for forfeiture, a sum of money equal to the total value of the property described in subparagraph (a).

3.  Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b)(1) and Title 18, United States Code, Section 982(b)(2), defendant CHANCHIKYAN, if so convicted, shall forfeit substitute property, up to the total value of the property described in the preceding paragraph if, as the result of any act or omission of the defendant, the property described in the preceding paragraph, or any portion thereof: (a) cannot be located upon

the exercise of due diligence; (b) has been transferred, sold to or deposited with a third party; (c) has been placed beyond the jurisdiction of the court; (d) has been substantially diminished in value; or (e) has been commingled with other property that cannot be divided without difficulty.  Substitution of assets shall not be ordered, however, where the convicted defendant acted merely as an intermediary who handled but did not retain the property in the course of the money laundering offense unless the defendant, in committing the offense or offenses giving rise to the forfeiture, conducted three or more separate transactions involving a total of $100,000 or more in any twelve-month period.

                              A TRUE BILL


                                   /S/
                              ─────────────────
                              Foreperson


TRACY L. WILKISON
United States Attorney

SCOTT M. GARRINGER
Assistant United States Attorney
Chief, Criminal Division

KRISTEN A. WILLIAMS
Assistant United States Attorney
Acting Chief, Major Frauds Section

JOSEPH S. BEEMSTERBOER
Chief, Fraud Section
U.S. Department of Justice

PATRICK J. QUEENAN
Trial Attorney, Fraud Section
U.S. Department of Justice